**TEXAS COMMERCE BANK, N.A., and Texas Commerce Equity Holdings, Inc., Petitioners,**

v.

**Linda GRIZZLE, as next friend of Brentley G. Grizzle, a minor, et al., Respondents.**

**No. 01–0211.**

Supreme Court of Texas.

Argued March 27, 2002.

Decided Dec. 31, 2002.

Rehearing Denied Feb. 27, 2003.

Robert B. Gilbreath, Charles A. Gall, Timothy J. Goodwin, Jenkins & Gilchrist, Barbara M.G. Lynn, Brett David Kutnick, Jeffrey S. Levinger, Carrington Coleman Sloman & Blumenthal, Leslie Mariam El-Hakam, George M. Kryder, III, Vinson & Elkins, Dallas, for Petitioner.

Christina Gratke Nason, Arlington, R. Michael Northrup, Julia F. Pendery, Shawn Malcolm, Godwin Gruber, P.C., Andrea M. Kuntzman, John Mathias Sjovall, Cowles & Thompson, Dallas, B. Michael Bennett, Bentonville, AR, Charles M. Hunt, Martha J. Hardwick, Christopher H. Rentzel, Bracewell & Patterson, Dallas, for Respondent.

Justice ENOCH delivered the opinion of the Court.

In this putative class action, The Frost National Bank ("Frost"), Texas Commerce Bank, N.A. ("TCB"), and their respective parent corporations, defendants in the trial court, challenge that part of the court of appeals' judgment reversing the trial court's summary judgment rendered in their favor. The court of appeals held that a trust instrument's exculpatory clause cannot, as a matter of public policy, exonerate Frost and TCB, as trustees of various trusts invested in each bank's respective stock, from Grizzle's claim that the banks engaged in self-dealing by merging and liquidating trust funds which caused the trusts to suffer losses.[1] The court of appeals also held that the trial court abused its discretion by striking the second through fourth amended petitions filed in the underlying action that contained purported interventions of new putative class representatives, and by rendering final judgment.[2] We disagree with the court of appeals on these points. Accordingly, we reverse in part that court's judgment and render judgment that Grizzle take nothing against the TCB and Frost defendants. The portion of the court of appeals' judgment that affirmed in part the trial court's summary judgment in favor of the Frost defendants has not been challenged.[3]

## I. Background

### A. The Brentley G. Grizzle Trust

On October 30, 1992, a Dallas County district court rendered a decree designating Frost as trustee for the Brentley G. Grizzle Trust (the "Grizzle Trust"). The Grizzle Trust was established under Texas Property Code chapter 142 to receive and administer settlement proceeds received by Brentley, a minor, from a wrongful death claim asserted when her father died. The Grizzle Trust was created with $200,000 in cash settlement proceeds. Frost, as trustee, invested that money in its own common stock and taxable fixed income funds, as permitted by federal law,[4] state law,[5] and the Grizzle Trust.[6]

The Grizzle Trust states that "[t]he broad powers herein conferred upon the Trustee shall always be exercised only in a fiduciary capacity, and nothing herein shall be construed to limit the fiduciary obligation of the Trustee."[7] The Grizzle Trust also contains an exculpatory clause which states:

> This instrument shall always be construed in favor of the validity of any act or omission of any Trustee, and a Trustee shall not be liable for any act or omission except in the case of gross negligence, bad faith, or fraud.[8]

1. 38 S.W.3d 265, 280–82.

2. *Id.* at 273–74, 287.

3. *Id.* at 271.

4. 12 C.F.R. § 9.18(a).

5. Tex. Prop.Code § 113.171.

6. Grizzle Trust, art. VI, para. E.

7. *Id.* art. V, para. H.

8. *Id.* art. V, para. C.

In addition, the Grizzle Trust permits a successor corporate trustee through the purchase of, or merger or consolidation with, the original trustee, Frost.[9] The successor trustee succeeds to all "the rights, duties, and powers" of the original trustee.[10]

## B. Frost And TCB Exchange Banks

On April 14, 1994, TCB and its parent corporation, Texas Commerce Equity Holdings, Inc., and Frost and its parent corporation, the New Galveston Company, entered into what the parties call a merger or a bank swap. We will refer to the transaction as a merger. The merger consisted of Frost transferring its Dallas bank to TCB, and TCB transferring its Corpus Christi bank to Frost. By this transfer, the two banks exchanged all assets including their trusts. TCB accordingly became trustee of the Grizzle Trust.

The day after the merger, Richard W. Phillips, TCB's Senior Vice–President and Trust Officer, sent a letter apprizing TCB's new trust customers, including Grizzle, of the merger and TCB's new role as trustee. The letter states, in part:

> As we previously announced, Texas Commerce Bank and Cullen/Frost Bank of Dallas, N.A., have merged and we are pleased to welcome you to Texas Commerce.
>
> Texas Commerce and Cullen/Frost share the same customer-oriented culture, and we look forward to working together to ensure that your relationship with Texas Commerce is a very positive one. Here is a brief summary of what you can expect:
>
> > No changes are required to administer your trust account(s). You can count on receiving the same high quality service and attention from your

trust administrator/relationship manager.

> It will not be necessary to make any adjustments to your trust documents or agreements defining your account. . . .
>
> As service enhancements or other developments are planned, you will be notified well in advance.

Soon after this letter was sent, TCB liquidated the Frost stock and income funds it had acquired from the merger into cash on April 30, 1994. Frost did the same thing with the TCB stock and income funds it had acquired from the merger. TCB and Frost assert that they did this because federal law and regulations prohibit banks, acting as trustees, from investing in common trust funds managed by another bank.

On May 6, 1994, TCB placed the liquidated funds into a short-term investment earning interest. A few weeks later, TCB reinvested those funds in fixed income and common stock funds managed by TCB. Because market forces had caused the Grizzle Trust funds' value to decrease when the merger occurred, liquidating the Frost funds resulted in the Grizzle Trust realizing a long-term capital tax loss of $5,508.70.

## C. Linda Grizzle Files Suit

On April 11, 1996, Linda Grizzle, as next friend of her daughter Brentley, brought suit individually and on behalf of a putative class of trust beneficiaries against the TCB and Frost defendants. The suit was based on alleged damages sustained by the trusts, including the Grizzle Trust, as a result of the merger. Grizzle asserted numerous claims including breach of fiducia-

**9.** *Id.* art. IV, para. C.

**10.** *Id.*

ry duty, deceptive trade practices, negligence, gross negligence, fraud, conspiracy, and breach of contract.

On December 27, 1996, the Frost defendants moved for summary judgment, asserting among other grounds, that the Grizzle Trust's exculpatory clause precluded liability. On January 13, 1997, the TCB defendants filed a similar motion for summary judgment. Grizzle opposed the summary judgment motions and filed her own affidavit, which she subsequently amended. In her amended affidavit, she stated that her daughter's loss included audit fees and other charges allegedly netted against the liquidation proceeds allocable to the Grizzle Trust. Grizzle further stated that she was never provided the option of allowing another bank in the Frost banking system to continue administering the Grizzle Trust.

On February 10, 1997, the trial court heard the summary judgment motions. On February 17, 1997, Grizzle filed a first amended petition that sought to add, among other things, claims that the TCB and Frost defendants had engaged in self-dealing. Three days later, Grizzle filed a second amended petition that sought to add Marian Frances Anne Rucker as an additional plaintiff.

### D. The Trial Court's Ruling

On March 4, 1997, the trial court noted on the docket sheet that it was granting the TCB and Frost defendants' motions for summary judgment. The docket sheet further indicates that, on March 6, 1997, the trial court notified all counsel of its ruling. The trial court did not, however, sign a written order at that time.

While awaiting the trial court's signing of the summary judgment order, Frost attempted to depose Rucker, named in the second amended petition. Grizzle's counsel stated, however, that "[i]n light of Mrs.

Rucker's health problems, we have decided to drop her as a Plaintiff in this matter." On the same day, March 21, 1997, Grizzle filed a third amended petition. This time Grizzle purported to add Nesbit Wehde as an additional plaintiff and to make other substantive changes in the petition, including dropping certain claims. Neither Rucker's name nor her individual claims appeared in the third amended petition.

On March 25, 1997, the trial court signed and rendered summary judgment against Grizzle based on her original and first amended petitions. The next day, the trial court received a motion for class certification that Grizzle had filed. Grizzle and Wehde also filed a motion for leave to file the third amended petition and moved for a new trial on Grizzle's claims. The TCB and Frost defendants opposed the filing of the third amended petition as untimely. In addition, because the trial court had *sua sponte* questioned whether Wehde's attempt to join the lawsuit in the third amended petition was a misnamed "plea in intervention," the TCB and Frost defendants alternatively moved to strike Wehde's purported intervention.

On May 20, 1997, the trial court signed orders denying the motion for reconsideration and/or for new trial and striking the third amended petition or, alternatively, Wehde's purported intervention. The trial court did not consider the motion for class certification.

### E. Grizzle's First Appeal

Grizzle appealed the trial court's orders. But the court of appeals, in an unpublished opinion and order, dismissed the appeal for lack of jurisdiction. Although Grizzle had indicated that Rucker was being dropped as a party due to poor health, there was no trial court order disposing of Rucker's claims in the second amended petition.

The court of appeals accordingly concluded that the trial court's order striking the third amended petition restored the second amended petition as the live pleading. Neither party sought this Court's review of that determination.

### F.   The Trial Court's Subsequent Ruling

After the court of appeals dismissed Grizzle's appeal, the TCB and Frost defendants moved the trial court to enforce what they contend was Rucker's prior nonsuit or, alternatively, to strike the second amended petition and/or Rucker's purported intervention. The day before the hearing, Grizzle responded and, for a fourth time, tried to amend her petition by adding Rucker's estate as a class representative. The trial court struck the second and fourth amended petitions by order dated November 10, 1997, and rendered final judgment on January 21, 1998.

### G.   Grizzle's Second Appeal

Grizzle and the other individuals who attempted to join the lawsuit appealed, asserting that the trial court erred in rendering summary judgment for the TCB and Frost defendants. The court of appeals affirmed in part and reversed in part, remanding the case to the trial court for further proceedings.[11]

Citing other courts of appeals' decisions, the court of appeals here concluded that the Grizzle Trust's exculpatory clause could not, as a matter of public policy, vitiate a claim for, among other things, self-dealing.[12] The court of appeals held

that self-dealing included misapplying or mishandling trust funds and failing to promptly reinvest substantial sums of trust monies.[13] The court of appeals held there was evidence that TCB failed to promptly reinvest liquidated funds, which was evidence of mishandling of trust funds included within the meaning of self-dealing.[14] The court of appeals concluded that because a fact issue existed about whether TCB and Frost had engaged in self-dealing, the exculpatory clause did not support the trial court's summary judgment.[15]

The court of appeals further held that the summary judgment evidence raised a fact question about whether the Frost defendants' failure to disclose the consequences of the merger and liquidation amounted to a misrepresentation.[16] The court of appeals also concluded that the summary judgment could not be upheld based on the Frost defendants' argument that Grizzle was not entitled to a separate recovery on a fraud claim because there were no damages attributed to fraud rather than contract.[17] According to the court of appeals, Grizzle's fraud claim arose from TCB's letter notifying her of the merger and telling her that no changes were required in administering the trust, no adjustments to the trust documents were necessary, and as other developments were planned, beneficiaries would be notified in advance.[18] The court of appeals concluded that Grizzle's fraud claim arose from being induced to accept the change in trusteeship based on TCB's assurances that no change in the trust agreements or

11.   38 S.W.3d at 271.

12.   *Id.* at 281.

13.   *Id.*

14.   *Id.* at 281–82.

15.   *Id.* at 282.

16.   *Id.*

17.   *Id.* at 283.

18.   *Id.*

their administration was necessary.[19]

The court of appeals further held that the summary judgment evidence presented a fact issue about whether audit and other fees were assessed against the trusts.[20] The court of appeals noted that 12 C.F.R. § 9.18(b)(12) (now § 9.18(b)(10)) provides that "[t]he bank shall absorb the costs of establishing or reorganizing a collective investment fund," and that audit fees could fall within that provision.[21] Thus, the court of appeals concluded that § 9.18 supported Grizzle's argument that federal banking regulations did not excuse TCB's failure to mitigate any damages, such as charging expenses related to the liquidation and reinvestment of the funds after the merger.[22]

The court of appeals also concluded that the trial court abused its discretion in striking the amended petitions/purported interventions of the Ruckers and Wehde.[23] According to the court of appeals, an intervention is proper at any time before a final decision on the merits.[24] Rucker intervened before the trial court rendered its summary judgment on Grizzle's individual claims. And when Wehde intervened, there had been no final judgment rendered on Rucker's claim or the class action. Therefore, the court of appeals concluded that the interventions were timely, and the trial court abused its discretion by striking Wehde's claim without affording her an opportunity to respond to the TCB and Frost defendants' motions to strike.[25]

The court of appeals resolved several other issues, but we either do not need to resolve them to decide this case or they are not before us. We accordingly do not discuss them. We granted the TCB and Frost defendants' petitions for review to determine, among other things, whether a trust's exculpatory clause can, without violating public policy, exonerate a corporate trustee from liability for self-dealing defined as the misapplication or mishandling of trust funds, including the failure to promptly reinvest trust monies. In addition to briefing from the parties, we received an amicus brief from Texas Bankers Association, Independent Bankers Association of Texas, and Texas Savings & Community Bankers Association.

## II. Analysis

### A. The Exculpatory Clause's Effect

The TCB and Frost defendants argue that the court of appeals erred in holding that the Grizzle Trust's exculpatory clause did not exonerate them from liability. The TCB and Frost defendants contend that the court of appeals erroneously held there was evidence that TCB failed to promptly reinvest the liquidated funds which, in turn, was evidence of mishandling trust funds, which fell within the meaning of self-dealing. The TCB and Frost defendants assert that the court of appeals' broad self-dealing exception is not authorized by the Texas Trust Code,[26] which sets forth the only self-dealing exceptions to exculpatory clauses the Legislature deemed appropriate.[27] The TCB and Frost defendants further assert that, even if such a self-dealing exception is appropri-

---

19.  *Id.*

20.  *Id.* at 279.

21.  *Id.* at 280.

22.  *Id.*

23.  *Id.* at 273–74.

24.  *Id.* at 272.

25.  *Id.* at 272–73.

26.  Tex. Prop.Code §§ 111.001–115.017.

27.  *Id.* § 113.059(b).

ate, the federally-approved merger and subsequent liquidations of trust funds required by federal law cannot constitute self-dealing as a matter of law.

Grizzle responds with numerous arguments, including that public policy prohibits an exculpatory clause from exonerating a trustee from liability for self-dealing to further its own financial interests. Additionally, Grizzle asserts that the court of appeals correctly recognized that self-dealing includes mishandling of trust funds and unreasonable delay in making investments. Grizzle also contends that Trust Code section 113.059, which authorizes exculpatory clauses, does not apply to the Grizzle Trust because the Grizzle Trust was created under Texas Property Code chapter 142, which is not part of the Trust Code.

■ As an initial matter, we disagree with Grizzle's argument that Trust Code section 113.059 does not apply to trusts created under Property Code chapter 142. The Trust Code applies to "express trusts" created on or after January 1, 1984.[28] The Trust Code states that it does not apply to a resulting trust, a constructive trust, a business trust, or a security instrument.[29] But the Trust Code does not say that it does not apply to trusts created under Property Code chapter 142.

■ Instead, the Trust Code defines an "express trust" as:

a fiduciary relationship with respect to property which arises as a manifestation by the settlor [the person who creates the trust[30]] of an intention to create the relationship and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person.[31]

Property Code section 142.002 provides that a court may render a decree creating a trust to manage funds for a minor's benefit.[32] Thus, we conclude that a trust created under Property Code chapter 142 by the court acting as settlor is an "express trust" to which the Trust Code applies.[33]

■ Next, we agree with the TCB and Frost defendants that a trust instrument's exculpatory clause can relieve a corporate trustee of liability for self-dealing defined as the misapplication or mishandling of trust funds, including the failure to promptly reinvest trust monies. We base our decision on the Trust Code's express language.

We start with Trust Code section 111.002, which provides, in part, that "[i]f the provisions of this subtitle[34] and the terms of a trust conflict, the terms of the trust control except the settlor may not relieve a corporate trustee from the duties, restrictions, and liabilities under Section 113.052 or 113.053."[35] Sections 113.052 and 113.053 relate to certain types of self-dealing. Section 113.052 generally prohibits a trustee from lending trust funds to itself; section 113.053 generally prohibits a trustee from buying trust property from itself and selling trust property to itself. Grizzle does not claim that the TCB or Frost defendants' actions violated sections 113.052 or 113.053. And neither of these

---

28. *Id.* §§ 111.003, 111.006(1).

29. *Id.* § 111.003.

30. *Id.* § 111.004(14).

31. *Id.* § 111.004(4).

32. *Id.* § 142.002(a).

33. *See Brownsville–Valley Reg'l Med. Ctr., Inc. v. Gamez,* 894 S.W.2d 753, 756 (Tex.1995).

34. Tex. Prop.Code §§ 111.001–115.017.

35. *Id.* § 111.002(a).

statutory provisions defines self-dealing as the court of appeals did here.[36]

Further, Trust Code chapter 113 discusses a trustee's duties in administering a trust. Section 113.051 provides that "[i]n the absence of any contrary terms in the trust instrument or contrary provisions of this subtitle, in administering the trust the trustee shall perform all of the duties imposed on trustees by the common law." [37] In addition, section 113.056 provides standards that govern a trustee's duties concerning trust management and investment. That section states, in part:

> Unless the terms of the trust instrument provide otherwise, in acquiring, investing, reinvesting, exchanging, retaining, selling, supervising, and managing trust property, . . . a trustee shall exercise the judgment and care under the circumstances then prevailing that persons of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income from as well as the probable increase in value and the safety of their capital.[38]

Trust Code chapter 114 generally discusses a trustee's liability to the beneficiary for breach of trust. For example, section 114.001 provides, in part:

> (a) The trustee is accountable to a beneficiary for the trust property and for any profit made by the trustee through or arising out of the administration of the trust, even though the profit does not result from a breach of trust; . . .

> (c) A trustee who commits a breach of trust is chargeable with any damages resulting from such breach of trust, including but not limited to:

> (1) any loss or depreciation in value of the trust estate as a result of the breach of trust;

> (2) any profit made by the trustee through the breach of trust; or

> (3) any profit that would have accrued to the trust estate if there had been no breach of trust.[39]

■ While the Trust Code imposes certain obligations on a trustee—including all duties imposed by the common law [40]—the Trust Code also permits the settlor to modify those obligations in the trust instrument. Indeed, Trust Code section 113.059 broadly states that a settlor may relieve a corporate trustee from a "duty, liability, or restriction imposed by this subtitle," except for those contained in sections 113.052 and 113.053.[41] The Trust Code contains no other limitations on relieving a corporate trustee from liability for self-dealing in a trust instrument. Thus, we conclude that the Trust Code allows an exculpatory clause to relieve a corporate trustee from liability for self-dealing defined as misapplying or mishandling trust funds, including failing to promptly reinvest trust monies, unless those activities violate the prohibitions in sections 113.052 and 113.053.

We disagree with the court of appeals' conclusion that public policy precludes such a limitation on liability. The court of appeals based its holding on other courts of appeals' decisions beginning with *Lang-*

---

36. *See* 38 S.W.3d at 281 (quoting *Langford v. Shamburger,* 417 S.W.2d 438, 444 (Tex.Civ. App.-Fort Worth 1967, writ ref'd n.r.e.)).

37. Tex. Prop.Code § 113.051.

38. *Id.* § 113.056(a).

39. *Id.* § 114.001.

40. *Id.* § 113.051.

41. *Id.* § 113.059.

ford v. Shamburger.[42]  Langford held that "[i]t would be contrary to the public policy of this State to permit the language of a trust instrument to authorize self-dealing by a trustee."[43]

■ But as we have previously acknowledged, the State's public policy is reflected in its statutes.[44]  And the Legislature has spoken on self-dealing and exculpatory clauses in the Trust Code. The Legislature has expressly authorized the use of exculpatory clauses, stating that they can relieve a corporate trustee from liability except for certain narrow types of self-dealing not at issue here.  We therefore decline to hold that a trust instrument cannot exonerate a trustee from liability for failing to promptly reinvest trust monies based on public policy.[45]  As we stated in Lawrence v. CDB Services, Inc.:

> Public policy, some courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law.[46]

We recognize that the Trust Code authorizes a settlor to exonerate a corporate trustee from almost all liability for self-dealing, and that this broad authority can lead to harsh results.  But we presume the Legislature was aware of this when it enacted the Texas Trust Act in 1943 [47]—the predecessor to the Texas Trust Code—and when it subsequently enacted the Trust Code effective January 1, 1984.  When the Texas Trust Act came into being, the Restatement of Trusts § 222 [48] had been written; and when the Legislature enacted the Trust Code, the Restatement (Second) of Trusts § 222 [49] had been written.  Both Restatements state, in part: "[a] provision in the trust instrument is not effective to relieve the trustee ... of liability for any profit which the trustee has derived from a breach of trust."[50]

Yet, in addressing self-dealing, the Legislature chose—in the 1943 Trust Act, in the 1983 Trust Code, and again in the current Trust Code—only to prohibit, subject to certain exceptions, exculpatory clauses that permit a corporate trustee to loan trust money to itself, buy trust property from itself, or sell trust property to itself.[51]  We therefore conclude that public

---

**42.** 417 S.W.2d at 444; see also McLendon v. McLendon, 862 S.W.2d 662, 676 (Tex.App.-Dallas 1993, writ denied); Grider v. Boston Co., 773 S.W.2d 338, 343 (Tex.App.-Dallas 1989, writ denied); InterFirst Bank Dallas, N.A. v. Risser, 739 S.W.2d 882, 899 (Tex.App.-Texarkana 1987, no writ).

**43.** Langford, 417 S.W.2d at 444.

**44.** Churchill Forge, Inc. v. Brown, 61 S.W.3d 368, 373 (Tex.2001); Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 553 (Tex.2001).

**45.** See Pub. Util. Comm'n of Tex. v. Cofer, 754 S.W.2d 121, 124 (Tex.1988).

**46.** 44 S.W.3d at 553 (quoting Sherrill v. Union Lumber Co., 207 S.W. 149, 153–54 (Tex.Civ. App.-Beaumont 1918, no writ)).

**47.** Act of April 19, 1943, 48th Leg., R.S., ch. 148, § 22, 1943 Tex. Gen. Laws 238 (amended 1983) (current version at TEX. PROP.CODE § 113.059).

**48.** RESTATEMENT OF TRUSTS § 222 (1935).

**49.** RESTATEMENT (SECOND) OF TRUSTS § 222 (1959).

**50.** RESTATEMENT OF TRUSTS § 222; RESTATEMENT (SECOND) OF TRUSTS § 222(2).

**51.** See Act of April 19, 1943, 48th Leg., R.S., ch. 148, §§ 10, 11, 12, 22, 1943 Tex. Gen. Laws 234–35, 238 (amended 1983); Act of June 19, 1983, 68th Leg., R.S., ch. 576, §§ 113.016, 113.032, 113.033, 113.037, 1983 Tex. Gen. Laws 3665–66, 3667–68, 3669–70

policy, as expressed by the Legislature in the Trust Code, does not preclude a settlor from relieving a corporate trustee from liability for self-dealing, except for what is specified in sections 113.052 and 113.053. We disapprove *Langford* and its progeny to the extent they suggest otherwise. We further hold that the court of appeals here erred in holding that the Grizzle Trust's exculpatory clause could not relieve the TCB and Frost defendants from liability for misapplying and mishandling trust funds when there was no claim that, by doing so, the TCB and Frost defendants violated sections 113.052 or 113.053.

That does not end our inquiry though. The Grizzle Trust exonerates TCB and Frost from liability as trustee for any act or omission "except in the case of gross negligence, bad faith, or fraud." [52] We therefore must decide whether the TCB and Frost defendants are entitled to judgment as a matter of law because their actions did not constitute gross negligence, bad faith, or fraud.

The TCB and Frost defendants argue that the facts supporting Grizzle's purported damages are that the TCB and Frost defendants: (1) converted the Grizzle Trust's investments into cash, causing the trust to realize a long-term capital loss of $5,508.70 due to a prior market decrease in the investments' value; (2) delayed reinvesting the trust funds, causing the trust to lose income that otherwise would have been realized; and (3) charged audit and other fees that were applied to the Grizzle Trust. According to the TCB and Frost defendants, those facts, even if true, constituted no more than mere failures to exercise the degree of judgment required under the circumstances. They did not amount to gross negligence, bad faith, or fraud.

The TCB and Frost defendants assert that federal law required TCB to liquidate the trust's investment in Frost funds,[53] and it was not gross negligence or bad faith to comply with federal law. They argue that the brief delay in reinvesting the funds was not even a simple breach of trust, much less gross negligence or bad faith. And charging audit fees was not gross negligence or bad faith, particularly when the Grizzle Trust authorized the trustee to charge fees.

The TCB and Frost defendants also argue that Grizzle's fraud allegations are without merit. Grizzle bases her fraud claim on the letter from TCB's Vice–President welcoming her as a new customer. The TCB and Frost defendants argue that the statements made in that letter cannot support a fraud claim as a matter of law. Moreover, the TCB and Frost defendants assert, Grizzle admitted that she did not rely on the letter. The court of appeals nevertheless determined that "Grizzle's fraud claim arises from being induced to accept the change in trusteeship resulting from the merger on [the letter's] assurances that no change in the trust agreements or their administration was necessary...." [54] The TCB and Frost defendants argue that the letter was sent after the merger and, as a matter of federal law, substituting TCB as trustee was automatic. Thus, they contend that the court of appeals erred in holding that the letter induced Grizzle to accept the change in trusteeship.

Grizzle responds that the TCB and Frost defendants could have avoided this

(amended 1984); Tex. Prop.Code §§ 113.052, 113.053, 113.059.

**52.** Grizzle Trust, art. V, para. C.

**53.** *See* 12 C.F.R. § 9.18.

**54.** 38 S.W.3d at 283.

lawsuit by giving their customers advance notice of the merger and its ramifications and allowing their customers to move their trust accounts to other branches within the same bank system. Grizzle asserts that the TCB and Frost defendants' conduct in how they structured and consummated their merger qualifies as an intentional adverse act and reckless indifference about the beneficiaries' best interests. According to Grizzle, only their trust customers' interests should have guided the TCB and Frost defendants' decisions, not whether the merger would be to their own economic advantage. She claims that the TCB and Frost defendants acted in bad faith and with gross negligence by looking out for their own interests at the beneficiaries' expense, thus violating the duties of loyalty, candor, and fidelity.

Grizzle also argues that TCB's welcome letter was affirmatively misleading because it implied that TCB's takeover as trustee had nothing but positive results for the former Frost trust customers. Therefore, Grizzle concludes that the court of appeals properly held that "the summary judgment evidence raises a fact issue on whether the Frost defendants' failure to disclose the consequences of the merger and liquidation amounted to misrepresentation." [55]

■■■■ Summary judgment is appropriate only when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.[56] In reviewing a traditional motion for summary judgment, such as the one granted to the TCB and Frost defendants, the reviewing court must resolve every doubt and indulge every reasonable inference in the nonmovant's favor.[57] All evidence favorable to the nonmovant will be taken as true.[58]

We begin our analysis of whether, as a matter of law, the TCB and Frost defendants are exculpated from liability for their actions by focusing on the Grizzle Trust's provisions, as the Trust Code instructs us to do. Those provisions state, in part:

> Any corporation that shall succeed (by purchase, merger, consolidation, or otherwise) to all or the greater part of the assets of any corporate Trustee shall succeed to all the rights, duties, and powers of such corporate Trustee, as Trustee of this trust.[59]

> The Trustee shall also be reimbursed for all reasonable expenses incurred in connection with the administration of the trust.[60]

> The Trustee may buy, sell, or trade any security of any nature (including stocks, stock rights, warrants, bonds, debentures, notes, certificates of interest, certificates of indebtedness, and options) or any other things of value issued by any person, firm, association, trust, corporation, or body politic whatsoever. In addition, the Trustee may invest the trust assets in the Trustee's common trust funds.[61]

**55.** 38 S.W.3d at 282.

**56.** *D. Houston, Inc. v. Love,* 92 S.W.3d 450 (Tex.2002).

**57.** *Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997); *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996).

**58.** *Southwestern Elec. Power Co.,* 73 S.W.3d at 215; *Science Spectrum, Inc.,* 941 S.W.2d at 911; *Friendswood Dev. Co.,* 926 S.W.2d at 282.

**59.** Grizzle Trust, art. IV, para. C.

**60.** *Id.* art. V, para. A.

**61.** *Id.* art. VI, para. E.

The Trustee may sell, exchange, alter, mortgage, pledge, or otherwise dispose of trust property ... pay all reasonable expenses ... join in, by deposit, pledge, or otherwise, any plan of reorganization or readjustment of any investments of the trust, and vest in a protective committee or other legal entity such power as in the Trustee's opinion may be desirable; and sell for cash and/or credit all or any part of the trust estate.[62]

The Trustee may employ and compensate agents and other employees, including attorneys, accountants, and investment advisers.... [63]

Stock dividends and capital gains shall be treated as corpus. Except as herein otherwise specifically provided, the Trustee shall determine the manner in which expenses are to be borne and receipts credited between corpus and income.... [64]

The Trustee shall confer with the Beneficiary, or the Beneficiary's legal guardian or other legal representative if the Beneficiary is a minor or incapacitated person, from time to time concerning the needs of the Beneficiary and shall consider (but shall not be bound by) the requests of the Beneficiary or the Beneficiary's legal guardian or other legal representative, as the case may be, concerning the administration of the trust, including, but not limited to, the investment and distribution of the trust assets.[65]

■ Given these provisions, we conclude that the TCB and Frost defendants cannot be held liable for their actions in this case.

For example, Grizzle complains that the TCB and Frost defendants did not give her advance notice of the merger or offer her the option to move the Grizzle Trust to another bank. While we recognize that Grizzle has a strong interest in protecting her daughter's trust assets, the Grizzle Trust contains no provision requiring such disclosures and options. And we decline to read such a provision into the trust.[66] Accordingly, the trustee's failure to provide such disclosures and options does not amount to gross negligence, bad faith, or fraud.

■ We likewise conclude that TCB's brief delay in reinvesting the liquidated funds does not give rise to liability under the Grizzle Trust. Within several days following the merger, TCB placed the funds into an interest-bearing account. Within a few weeks thereafter, TCB had reinvested the funds into its own common stock funds. We accordingly agree with the Supreme Judicial Court of Massachusetts that:

> [a]t most, these [delays] were no more than failures to exercise the degree of judgment required in the circumstances. They did not amount to bad faith or to intentional breaches of trust or to reckless indifference to the interest of the beneficiaries.[67]

■ We next decide whether the TCB and Frost defendants can be held liable under the Grizzle Trust for imposing audit fees and other expenses incurred from liquidating trust assets and reinvesting them. We note that if there had been no merger and Frost had decided to sell the Grizzle

---

62. *Id.* art. VI, para. M.

63. *Id.* art. VI, para. S.

64. *Id.* art. VI, para. V.

65. *Id.* art. VII, para. D.

66. *See Danciger Oil & Ref. Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941).

67. *New England Trust Co. v. Paine,* 317 Mass. 542, 59 N.E.2d 263, 272 (1945).

Trust's assets, liquidate them into cash, and reinvest them in other assets, there would be no liability under the trust solely because that transaction caused the trust to realize tax consequences and incur audit and other fees. The Grizzle Trust gives its trustee broad authority to manage the trust, including the authority to sell assets and reinvest them. The Grizzle Trust recognizes that such transactions may produce tax consequences and result in fees being charged to the trust. And the Grizzle Trust authorizes the trustee to pay all reasonable expenses incurred in administering the trust, including expenses incurred in selling the assets. Therefore, absent some assertion that the investments themselves were made with gross negligence, in bad faith, or fraudulently, the trustee cannot be held liable under the Grizzle Trust for exercising the authority and discretion given to it.

We see no reason to reach a different result simply because, in this case, the sale of assets and the consequences that followed resulted from the trustee's decision to enter into a merger. The Grizzle Trust contemplates that a merger or other transaction may occur that results in a new trustee. And Grizzle does not argue that Frost could not enter into the merger; nor does she complain about the investments TCB made as the new trustee. Instead, she complains about the audit and other fees charged to the trust because of the merger.

But the fees resulted from Frost exercising its discretion under the Grizzle Trust to merge with TCB. Once that occurred, TCB, as the new trustee, was authorized to liquidate the Frost stock in which the Grizzle Trust was invested and reinvest that money in TCB stock. Grizzle does not contend otherwise. And the Grizzle Trust contemplates that fees may be incurred in such a situation and authorizes the trustee to pay them.

■ Grizzle argued below that 12 C.F.R. § 9.18(b)(12) (now § 9.18(b)(10)) demonstrated that federal law did not excuse TCB's failure to mitigate damages such as charging expenses related to the merger. Section 9.18 states that a "bank shall absorb the expenses of establishing or reorganizing a collective investment fund,"[68] which is defined, in part, as "[a] fund maintained by the bank ... exclusively for the collective investment and reinvestment of money contributed to the fund by the bank ... in its capacity as trustee...."[69] This begs the question of whether Grizzle could assert a claim based on the federal regulations. But Grizzle did not argue or brief this question here or below. We therefore decline to address it. And as we have otherwise discussed, the Grizzle Trust authorizes its trustee to pay the reasonable expenses incurred in administering the trust, including expenses incurred from liquidating funds and investing in others. We accordingly decline to hold, under the circumstances, that assessing fees in connection with the merger amounted to gross negligence, bad faith, or fraud.

■ Moreover, TCB's letter to Grizzle informing her of the merger did not raise a fact question with respect to Grizzle's fraud claim, either by its statements or its omissions. The court of appeals concluded that Grizzle's fraud claim arose from "being induced to accept the change in trusteeship resulting from the merger."[70] But the Grizzle Trust did not provide Grizzle with approval authority over a change in

**68.** 12 C.F.R. § 9.18(b)(10).

**69.** *Id.* § 9.18(a)(1).

**70.** 38 S.W.3d at 283.

the trusteeship. Further, Grizzle does not complain about TCB becoming the new trustee except for the fact that she was not informed of the consequences that flowed from that change. As we have said, those consequences, and the Frost and TCB defendants' failure to inform her of them, do not constitute gross negligence, bad faith, or fraud.

In short, Grizzle failed to create a fact issue that TCB or Frost acted or failed to act as a result of gross negligence, bad faith, or fraud. We accordingly hold that the TCB and Frost defendants are entitled to judgment as a matter of law on Grizzle's individual claims against them. We therefore need not reach the TCB and Frost defendants' other arguments about why they are entitled to summary judgment on Grizzle's claims.

## B. The Interventions/Amended Petitions And Class Claims

■ Because this is a putative class action, we must decide what happens to the putative class claims now that we have decided that the trial court properly granted summary judgment for the TCB and Frost defendants on Grizzle's claims. We look to federal decisions interpreting class action procedures for guidance.[71]

■ Normally, if summary judgment against the sole class representative is proper on all the class representative's claims, then the entire case including the class claims may be dismissed.[72] Under federal decisions, if a putative class representative has no live individual claim, that individual has no standing to bring suit on behalf of a putative class.[73] Accordingly, claims made on behalf of a putative class by such an individual must fail as a matter of law.[74]

Here, however, Grizzle filed several amended petitions that attempted to add new putative class representatives. The parties spend a great deal of time arguing over the timeliness of the amended petitions, whether they could be filed without leave of court, and whether they were properly served on the TCB and Frost defendants. But we conclude that these arguments miss the point.

■ Regardless of when the amended petitions and purported interventions were filed, the trial court still had to consider Grizzle's standing to bring suit before granting the interventions through the amended petitions. As federal courts have recognized, "a plaintiff without a claim cannot be allowed to bring suit by making a class action allegation."[75] By the same token:

[A] third party cannot intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure in a class action suit to save a claim as to which the original plaintiff never had a claim "for the intervenors cannot possibly have a claim or defense in common with a plaintiff who never had a claim."[76]

---

**71.** *Gen. Motors Corp. v. Bloyed,* 916 S.W.2d 949, 954 & 954 n. 1 (Tex.1996).

**72.** *See Floyd v. Bowen,* 833 F.2d 529, 534 (5th Cir.1987); *Jacobs v. Gromatsky,* 494 F.2d 513, 514 (5th Cir.1974).

**73.** *Stanley v. Wal Mart Stores, Inc.,* 839 F.Supp. 430, 435 (N.D.Tex.1993).

**74.** *Id.*

**75.** *Turner v. First Wis. Mortgage Trust,* 454 F.Supp. 899, 913 (E.D.Wis.1978); *see Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 499 (7th Cir.1972).

**76.** *Turner,* 454 F.Supp. at 913 (quoting *Washington v. Wyman,* 54 F.R.D. 266, 272 (S.D.N.Y.1971)); *accord Applebaum v. State Farm Mut. Auto. Ins. Co.,* 109 F.R.D. 661, 663–64 (M.D.Pa.1986).

We conclude that because Grizzle has no live individual claim, the trial court properly struck the amended petitions which sought to add new class representatives who could not "possibly have a claim or defense in common with [Grizzle] who never had a claim." [77] For the same reason, the putative class claims Grizzle brought failed as a matter of law, and the trial court properly rendered final judgment for the TCB and Frost defendants. [78] Of course, the trial court's summary judgment on Grizzle's claims will not be res judicata against other individual plaintiffs or putative class members who remain free to assert any claims they have against the TCB and Frost defendants. [79]

### III. Conclusion

We conclude that the Grizzle Trust's exculpatory clause exonerated the TCB and Frost defendants from liability on Grizzle's claims. Thus, the trial court properly granted summary judgment for the TCB and Frost defendants. The court of appeals erred in concluding that the Grizzle Trust's exculpatory clause could not, as a matter of public policy, exonerate the TCB and Frost defendants from liability for allegedly mishandling trust funds when their actions did not constitute self-dealing under the Trust Code or amount to gross negligence, bad faith, or fraud for which the trustee is liable under the Grizzle Trust. Further, the trial court properly struck the amended petitions and purported interventions of new putative class representatives, because they could not have claims in common with Grizzle, who had no claim as a matter of law. The court of appeals erred in holding to the contrary. We accordingly reverse the court of appeals' judgment in part and render judgment that Grizzle take nothing against the TCB and Frost defendants.

Justice HANKINSON did not participate in the decision.

**77.** *See Turner,* 454 F.Supp. at 913; *Washington,* 54 F.R.D. at 272; *see also Applebaum,* 109 F.R.D. at 663–64.

**78.** *See* 38 S.W.3d at 274 (citations omitted).

**79.** *See Wright v. Schock,* 742 F.2d 541, 544 (9th Cir.1984).