

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

———————————————

No. 06-10-00005-CV

———————————————

SCOTT D. MARTIN, INDIVIDUALLY AND AS TRUSTEE OF THE RUBEN S.
MARTIN, III, DYNASTY TRUST, Appellant

V.

COURTNEY NOEL MARTIN AND ROBIN THOMAS MARTIN, Appellees

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 2008-1436-A

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter
Concurring Opinion by Chief Justice Morriss

O P I N I O N

## I.    Introduction

This case presents a question of whether a trustee owes fiduciary duties to the beneficiaries

of the trust even when the trust document relieves him of the duty of loyalty.  We hold that

statutory provisions impose certain duties on the trustee that cannot be waived; the evidence is

sufficient to support a jury finding that the trustee violated a fiduciary duty, but is legally

insufficient to support a jury determination of damages for the beneficiaries.

Scott D. Martin appeals the trial court's judgment finding him liable for failing to

administer the Dynasty Trust in good faith and for breach of fiduciary duty.   The beneficiaries of

the Dynasty Trust are Courtney Martin and Robin Thomas Martin, the children of Scott's brother,

Ruben S. Martin, III.   The majority of assets in the Dynasty Trust consist of stock in the family

company, Martin Resource Management Corporation (MRMC)—a private corporation.   MRMC

is a principal stockholder in Martin Midstream Partners, L.P. (MMLP).    In addition to being

trustee for the Dynasty Trust, Scott is a principal stockholder and board member of MRMC.[1]

Courtney and Robin alleged four different acts which Scott committed contrary to his

obligations as a fiduciary.   These acts were:   (1) filing a lawsuit in Harris County; (2) refusing to

resign as Trustee; (3) refusing to provide a disbursement to Robin for medical treatment; and

---

[1]At the time of the events in question, Scott was also a board member of MMLP.   After filing the Harris County lawsuit discussed below, Scott was removed from the board of directors of MMLP.

2

(4) failing to make payment which could have the Dynasty Trust in potential default.[2] A jury awarded Courtney and Robin $1,500,000.00 in compensatory damages; $200,000.00 to Courtney in mental anguish damages; $200,000.00 to Robin in mental anguish damages; $1,500,000.00 to Courtney in exemplary damages; and $1,500,000.00 to Robin in exemplary damages. The trial court reduced the exemplary damages and reduced Robin's mental anguish damages rendering judgment in the amount of $1,450,000.00 to Courtney, $1,250,001.00 to Robin, attorney's fees in the amount of $278,949.50, and $84,808.92 in costs. Scott appealed and Courtney and Robin have filed a cross-appeal.

Scott raises six issues on appeal, claiming the trial court erred in "imposing liability on Scott" based on the Harris County lawsuit because the trust or documents relieved him of the fiduciary duties alleged to have been breached. Scott argues the evidence is legally insufficient to support the jury's award of compensatory damages and challenges both the legal and factual sufficiency that he acted with "willful misconduct or personal dishonesty." Concerning Courtney's and Robin's claims other than the Harris County lawsuit, Scott alleges the evidence that he breached a fiduciary duty is legally and factually insufficient and the evidence of mental anguish is legally insufficient. Finally, Scott claims the trial court erred in awarding $84,808.92 in costs. Scott also briefs arguments that the evidence is legally and factually insufficient to support a finding of malice or gross negligence, that the trial court failed to instruct the jury

---

[2]We note that Courtney and Robin alleged additional breaches in the trial court. They limited their argument on appeal to the above four breaches.

3

concerning the definition of clear and convincing evidence, and that the trial court erred in refusing Scott's limiting instructions on compensatory damages.

Courtney and Robin concede the trial court's award of costs and the award of mental anguish damages to Robin were error, but contest Scott's remaining allegations. Courtney and Robin also raise two issues in their cross-appeal which claim the trial court erred in ordering a remittitur instead of suggesting a remittitur in lieu of a new trial and erred in holding the evidence was factually insufficient to support the amount of exemplary damages. Scott raises a counter-issue in the cross-appeal arguing that Courtney and Robin failed to preserve their complaint about the remittitur. In addition, Scott argues in the cross-appeal that the evidence is factually insufficient to support the exemplary damages.

We conclude, although the trust agreement contained an applicable exculpatory clause, Scott owed Courtney and Robin fiduciary duties which could not be waived under the Texas Trust Act. There is sufficient evidence these duties were breached, but legally insufficient evidence to uphold the damages finding. We reverse and render a take-nothing judgment.

## II.   Factual Background

R. S. Martin, Jr., founded the company which eventually became MRMC in 1951. MRMC owns approximately thirty-five percent of MMLP and owns 100 percent of MMLP's general partner, Martin Midstream GP, LLC. MMLP became a publicly traded company in 2002. MMLP is in the business of terminal and storage services for petroleum products and by-products,

4

natural gas services, marine transportation services for petroleum products and by-products, and sulfur-based processing manufacturing and distribution. MRMC was jointly managed for over twenty years by Ruben S. Martin, III, and Scott D. Martin, sons of the founders (who owned or controlled all of the voting shares and both of whom were on the five-member board of directors) in an informal, collaborative relationship.

The Dynasty Trust was created when Ruben and Scott purchased the shares in MRMC belonging to their nephew Terry. Ruben purchased half of Terry's shares and Scott purchased the other half. Ruben created the Ruben S. Martin, III, Dynasty Trust—an irrevocable trust created for the health, education, and welfare of Ruben's daughters, Courtney and Robin, as well as their children and grandchildren. Scott Martin agreed to be a trustee of the Dynasty Trust.[3]

Basically, an internecine power struggle over the control of MRMC arose between Ruben and Scott. Ruben contended that Scott was trying to take control of the company, while Scott took the position that it was Ruben's goal to "freeze" Scott out from corporate management.[4] Beginning in 2006, the brothers' relationship began to deteriorate regarding the general direction of the company, and their collegial relationship was finally fractured in 2007 when Ruben decided that MRMC should seek to acquire a refinery, while Scott opposed the move. In late 2007, Courtney and Robin asked Scott to resign as trustee of the Dynasty Trust.

---

[3]Scott created a similar trust for his children, and Ruben agreed to be the trustee for that trust.

[4]Scott testified Ruben started leaving him off of many of the e-mail communications, and MRMC, which had previously been governed informally by both Ruben and Scott, adopted a formal "governance matrix," with Ruben as CEO, but excluding Scott.

On January 18, 2008, a board meeting was held with less than a day's notice. At the meeting, which Scott did not attend, the board of MRMC issued shares and a number of employees exercised stock options. Scott contends these actions would have given Ruben effective control of 50.02 percent of the shares of MRMC. The share issuance was rescinded six days later after Scott threatened litigation.

Also in January 2008, Robin made a request for a disbursement to pay for medical costs. Robin testified she mailed a letter making the request to Scott, but never received a response. Robin had a "Medtronic device installed" to treat complications caused by a kidney failure in 2000.

It is alleged that Scott also placed the trust in a potential default situation. Pursuant to the terms of the purchase from Terry, the trust was required to pay Terry a payment of approximately $500,000.00 each year. Scott refused to make the payment unless Courtney and Robin agreed to "complete indemnification."[5] Ruben was forced to borrow money to make the payment on behalf of the trust. Scott argues, because the trust normally lacks the funds to make these payments, Ruben typically puts the money in the trust whenever a payment is due.[6] Scott argues the trust did not lose value or incur any damages. Courtney and Robin filed this lawsuit seeking to remove Scott as Trustee of the Dynasty Trust in July 2008.

---

[5]The record does not contain the terms of the requested indemnification agreement. When asked, "Just based on layperson understanding, does it mean that if you're to give your uncle a complete indemnification, he could have stole the stuff, and he was free to do it," Courtney responded, "Yes."

[6]Scott does not provide a citation to where in the record there is evidence of this practice.

6

Meanwhile, MRMC attempted to arrange a $40 million equity offering for MMLP and attempted to secure an additional $100 million line of credit for MRMC, which would have raised MRMC's line of credit to $315 million. On Wednesday, September 3, 2008, the details of the new financing were e-mailed to the MMLP board members, including Scott. The equity offering was planned after the close of business on Monday, September 8, 2008, and MMRC intended to close on the line of credit on Friday, September 12, 2008. On Friday, September 5, 2008, Scott filed a lawsuit in Harris County, Texas, against MRMC and its directors, including Ruben. Although the other directors attempted to convince Scott to dismiss the lawsuit and informed Scott the lawsuit would adversely affect the financing deals and the value of MRMC's stock,[7] Scott refused to withdraw his lawsuit. The equity offering and line of credit increase were cancelled. Although MRMC made solicitations to get alternative financing, MRMC failed to obtain additional financing. MRMC was forced to sell assets to secure capital to pay for the capital expenditures and forced to shut down programs. Courtney and Robin amended their pleadings in this case alleging that Scott's filing of the Harris County lawsuit constituted a breach of his fiduciary duties. The jury found Scott breached his fiduciary duties in two respects: (1) by filing the Harris County lawsuit against the corporation and (2) by other actions in which he failed to administer the trust in good faith and in accordance with its terms and purposes.

---

[7]The existence of the lawsuit was required to be disclosed to the banks.

### III. Breach of Fiduciary Duty—The Harris County Lawsuit

Scott argues, as a matter of law, the acts constituting the alleged breach fall outside the scope of the fiduciary relationship. According to Scott, he had "an absolute right to do what he wanted to do with his stock shares without regard to the fact that he was also a trustee of the [Dynasty Trust] that owned some shares in the same corporation." This claim is based on a provision of the trust, which is discussed in detail below, releasing Scott of fiduciary duties except those imposed by statute. Whether a legal duty exists is a question of law "unless the facts giving rise to the duty are disputed." *Thomas v. CNC Invs., L.L.P.*, 234 S.W.3d 111, 120 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Since there is no dispute concerning the facts giving rise to the duty, we will review de novo whether Scott had a fiduciary duty under the terms of the Dynasty Trust.

As this Court and the Tyler Court have explained, a trustee is merely the depository of the bare legal title. *City of Mesquite v. Malouf*, 553 S.W.2d 639, 644 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *Faulkner v. Bost*, 137 S.W.3d 254, 258 (Tex. App.—Tyler 2004, no pet.). "When a valid trust is created, the beneficiaries become the owners of the equitable or beneficial title to the trust property and are considered the real owners." *Malouf*, 553 S.W.2d at 644. "The trustee is vested with legal title and right of possession of the trust property but holds it for the benefit of the beneficiaries, who are vested with equitable title to the trust property." *Faulkner*, 137 S.W.3d at 258–59. The trustee has fiduciary duties to hold and manage the property for the

8

benefit of the beneficiaries. TEX. PROP. CODE ANN. §§ 113.051, 113.056(a) (West 2007). In general, a trustee "owes a trust beneficiary an unwavering duty of good faith, fair dealing, loyalty and fidelity over the trust's affairs and its corpus." *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 735 (Tex. App.—Corpus Christi 1994, writ denied); *see InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 888 (Tex. App.—Texarkana 1987, no writ). Scott argues the trust document excused him from the obligation to perform such duties.

### A.     Appellees' Counter-Issues

Section R of the trust entitled "Transactions with Beneficiaries and Fiduciaries" authorizes Scott, regardless of his role as trustee, to "deal" with the trustee or others as if he were dealing "in respect of transactions with disinterested parties . . . ." At oral argument, Courtney and Robin argued the terms of the Dynasty Trust only apply to "transactions" and the filing of a lawsuit is not a transaction and, therefore, the provisions relieving Scott of fiduciary responsibilities are inapplicable. Since this counter argument was raised at oral argument, we authorized the parties to file briefs on the issue. In its post-submission brief, Scott argues Courtney and Robin could not argue new issues for the first time at oral argument. Courtney and Robin argue, in their post-submission brief, that appellees can, at oral argument, raise new additional reasons to affirm the trial court.

The caselaw is consistent that new issues may not be presented for the first time during oral argument. *El Paso Natural Gas Co. v. Strayhorn*, 208 S.W.3d 676, 681 (Tex. App.—Texarkana

9

2006, no pet.) ("Oral argument should be limited to the issues and arguments raised in the written briefing. . . . Counsel should not waylay opponents at oral argument by raising new issues or alternative arguments not first presented in their briefs."); *accord French v. Gill*, 206 S.W.3d 737, 743 (Tex. App.—Texarkana 2006, no pet.) ("An issue or counter issue may not be raised for the first time at oral argument unless the issue has been first presented in the parties' written brief.").

Because they are appellees, Courtney and Robin argue the general rule does not apply. Courtney and Robin claim, as appellees, that they have no burden to raise every legal theory which supports the trial court's conclusions and do not waive any legal theory by failing to brief. In support of their argument, they note that an appellee does not even need to file a brief. *Commercial Credit & Control Data Corp. v. Wheeler*, 756 S.W.2d 769, 771 (Tex. App.—Corpus Christi 1988, writ denied) (Because the burden rests on the appellant to establish that errors were committed by the trial court, "[t]he appellees' failure to properly submit a brief does not in itself entitle appellant to a reversal.").

We agree that the general rule does not apply to counter-issues[8] raised by an appellee. In general, appellate courts will affirm a trial court's judgment if it can be upheld on any legal theory that finds support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re Brookshire Bros.*, 198 S.W.3d 381, 387 (Tex. App.—Texarkana 2006, orig. proceeding); *cf. Davis v. Bryan & Bryan, Inc.*, 730 S.W.2d 643, 644 (Tex. 1987) ("A reviewing court can reverse only

---

[8]A counter-issue or reply issues "are used to persuade the appellate court that an opponent's complaints are not well-taken" and can also raise independent grounds for affirmance. 6 McDonald & Carlson, *Texas Civil Practice* §§38.2, 38.9 (2d ed. 1998).

when there is error in the judgment of the court below."). While the Texas Supreme Court has forbidden appellate courts from reversing a trial court's judgment based on unassigned error, i.e., a ground not presented in the appellate briefs,[9] a counter-issue or reply issue does not allege error.[10] Because this Court can affirm on any legally correct theory,[11] we may address counter-issues supporting the trial court's judgment, i.e., alternative reasons to affirm the trial court, even if they are raised for the first time at oral argument. *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 478 n.6 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ("It is irrelevant, however, that [appellee] failed to address the DTPA claims in its brief, as an appellee need not raise cross-points or even file a brief to have this Court consider what was presented to the trial court; the burden rests on the appellant to establish grounds for reversal.").

## B.    Section R—The Exculpatory Clause

Scott argues the fiduciary duties were waived by the terms of the Dynasty Trust. Courtney and Robin argue the above exculpatory provisions, strictly construed, are limited to

---

[9]*Pat Baker v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *Estate of Pollack v. McMurrey*, 858 S.W.2d 388, 395 (Tex. 1993); *Allright, Inc. v. Pearson*, 735 S.W.2d 240 (Tex. 1987); *Wal-Mart Stores, Inc. v. Kelley*, 103 S.W.3d 642, 645 (Tex. App.—Fort Worth 2003, no pet.).

[10]A cross-issue, though, must be assigned because it alleges error. A cross-issue is an issue presented by appellee "to complain about some aspect of the lower court's judgment that is unsatisfactory." 6 McDonald & Carlson, *Texas Civil Practice* § 38.2.

[11]We note Scott relies upon our opinion in *French v. Gill*, 206 S.W.3d 737, 743 (Tex. App.—Texarkana 2006, no pet.). *French* is distinguishable from this case because it involved an appeal of a summary judgment and it applies only in that context. In a summary judgment case, we can only affirm on grounds specifically presented to the trial court in the summary judgment motion. TEX. R. APP. P. 33.1; TEX. R. CIV. P. 166a(c); *see City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex. 1979); *Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 206 (Tex. App.—Texarkana 2008, no pet.).

transactions with those parties listed in Section R and do not exculpate Scott for the breach of fiduciary duty at issue. We believe Courtney and Robin read Section R of the Dynasty Trust agreement too narrowly.

The general rule, under the Texas Trust Code,[12] is "[t]he terms of a trust prevail over any provision" of the Code subject to a few statutory exceptions not applicable to this case. TEX. PROP. CODE ANN. § 111.0035(b) (West Supp. 2011). Section R, "Transactions with Beneficiaries and Fiduciaries" of the trust agreement[13] creating the Dynasty Trust provides as follows:

> R.    Transactions with Beneficiaries and Fiduciaries.   The Trustee is authorized to purchase from, sell to, lend funds to, or otherwise deal with the Trustee or with the Trustee as a partner, member or officer in any partnership, limited liability company, corporation or other entity, or as executor, administrator, or guardian of the estate of any person, or with an affiliate of the Trustee, or with a director, officer, employee, employer, partner, or other business associate of the Trustee or the Trustee's affiliate, or with a relative of the Trustee, or with any beneficiary of any trust created hereunder or with any partnership, corporation, trust or other entity in which the Trustee may have an interest to the same extent and manner and for the same investment purposes as herein provided in respect of transactions with disinterested parties, except to the extent that the Texas Trust Code (or its successor statute) may expressly prohibit Settlor from authorizing any corporate Trustee serving hereunder from engaging in any such transaction.   The provisions of this paragraph are made in full realization that said Trustee may be a partner, officer, director, member, or stockholder in any such entity or an executor, administrator or guardian of an estate, and no principle or rule relating to self-dealing or divided loyalty shall be applied to any act of said Trustee, but said Trustee shall be held to the same standard of liability in respect of such transactions as in respect of transactions with disinterested persons.

---

[12]TEX. PROP. CODE ANN. §§ 11.001, *et seq*. (West 2004 & Supp. 2011).

[13]We note the trust agreement also contains the following provision: "S.  Liability of Trustee.  No individual Trustee shall be liable for negligence or error of judgment, but shall be liable only for such Trustee's willful misconduct or personal dishonesty."

12

Scott argues these terms were critical to him accepting the position as trustee and that he would not have agreed to be trustee otherwise.

When construing a contract, courts must give effect to the true intentions of the parties as expressed in the written instrument. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co*., 925 S.W.2d 565, 574 (Tex. 1996). The contract must be read as a whole, rather than by isolating a certain phrase, sentence, or section of the agreement. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999). "[E]xculpatory provisions included in trust instruments are strictly construed, and 'the trustee is relieved of liability only to the extent to which it is clearly provided that he shall be excused.'" *Jochec v. Clayburne*, 863 S.W.2d 516, 520 (Tex. App.—Austin 1993, writ denied) (quoting *Jewett v. Capital Nat'l Bank*, 618 S.W.2d 109, 112 (Tex. Civ. App.—Waco 1981, writ ref'd n.r.e.)).

Section R is entitled "Transactions with Beneficiaries and Fiduciaries" and grants the Trustee the right to operate "to the same extent and manner and for the same investment purposes as herein provided in respect of transactions with disinterested parties" except where prohibited by the Texas Trust Code. Further, it recognizes the trustee may serve as an officer of a related corporation, guardian of an estate, among other roles, and "no principle or rule relating to self-dealing or divided loyalty shall be applied to any act of said Trustee, but said Trustee shall be

13

held to the same standard of liability in respect of such transactions as in respect of transactions with disinterested persons."

Section R recognizes that even though Scott was actively involved in the related corporations and now was appointed trustee of the Dynasty Trust, it was agreed that Scott would be relieved of fiduciary duties except those mandated by the Texas Trust Code. The parties had a right to enter such an agreement.

First, we do not believe Section R is limited to transactions. The heading of the section is not determinative of its meaning. The general rule is that a heading does not either limit or expand the meaning of a section of a contract. *See Trico Marine Servs. v. Stewart & Stevenson Tech. Servs.*, 73 S.W.3d 545, 550 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Courts "construe the terms of the contract as a whole and consider all of its terms, not in isolation, but within the context of the contract." *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's*, 179 S.W.3d 619, 624 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Section R is composed of two clauses. The first clause authorizes the trustee "to purchase from, sell to, lend funds to, or otherwise deal with the Trustee . . . ." The word "transactions" is not used until the end of the first clause, when it states the standard of liability to be "the same extent and manner and for the same investment purposes as herein provided in respect of

14

transactions with disinterested parties." Similarly, in the second clause, the word "transactions" is not used until stating the standard of liability as "said Trustee shall be held to the same standard of liability in respect of such transactions as in respect of transactions with disinterested persons." The word "transactions" identifies the standard of care owed by the Trustee. The second exculpatory clause provides, "no principle or rule relating to self-dealing or divided loyalty shall be applied to any act of said Trustee . . . ." The provisions note no "act" of the Trustee is held to a higher standard than if the trustee was dealing with disinterested persons. In this sentence, the operative word is "act." The intent of the clause is to provide that the duty of loyalty does not apply to any "act" of the trustee.

Second, even if the section was limited to "transactions," the filing of a shareholder derivative lawsuit would be within the definition of "transaction." The word "transactions" is not defined in the contract. Courtney and Robin argue this Court should define "transactions" based on Merriam-Webster's definition, while Scott argues this Court should define "transactions" based on Black's Law Dictionary's definition. Merriam-Webster's defines "transaction" as "1 a: something transacted; *esp*: an exchange or transfer of goods, services, or funds . . . . 2 a: an act, process, or instance of transacting b: a communicative action or activity involving two parties or things that reciprocally affect or influence each other." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1327 (11th ed. 2003). Merriam-Webster's also defines "transact" as "to carry on business" or "1: to carry to completition . . . 2: to carry on the operation or management of:

15

Do." *Id.*

Scott argues we should define transaction as any activity involving two or more persons. Black's Law Dictionary defines transaction as "1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. Something performed or carried out; a business agreement or exchange. 3. Any activity involving two or more persons. . . ." BLACK'S LAW DICTIONARY 1635 (9th ed. 2009).

It is not necessary for us to choose between these various definitions. The restrictive definition urged by Courtney and Robin is inconsistent with the language of Section R. As noted above, the first clause contains the broad language "otherwise deal" and the operative word of the second clause is "act." There is nothing in the section which suggests "transactions" should be limited to contracts. The act complained of is Scott's filing a lawsuit against the corporation. The lawsuit at issue, a shareholder derivative suit, was the result of a business decision to engage in an act thought to be beneficial to Scott's business interest. Even if Section R is limited to transactions, when Scott filed the lawsuit in Harris County against MRMC, he conducted a business transaction within the meaning of Section R. Thus, only if the Texas Trust Code expressly prohibits the exculpation contained in Section R will Scott be accountable for fiduciary responsibility.

## C. The Texas Trust Code Does Not Permit All Fiduciary Duties to be Waived

Scott contends, as a matter of law, he did not breach any fiduciary duty owed to Courtney

16

and Robin. Scott's main argument is the Texas Trust Code permits a trust agreement to waive all fiduciary duties owed to the beneficiaries. Alternatively, Scott advances two arguments that the duty of good faith is limited only to an accounting or is limited only when the trustee is acting as a trustee.

### 1. *Commerce Bank v. Grizzle* **Has Been Overruled by Statute**

In 2003, the Texas Supreme Court held that the Texas Trust Code permits duties required by the common law to be modified except for the explicit limitations contained in statute. *Tex. Commerce Bank v. Grizzle*, 96 S.W.3d 240, 249 (Tex. 2002). The Texas Supreme Court stated:

> We recognize that the Trust Code authorizes a settlor to exonerate a corporate trustee from almost all liability for self-dealing, and that this broad authority can lead to harsh results. But we presume the Legislature was aware of this when it enacted the Texas Trust Act in 1943 -- the predecessor to the Texas Trust Code -- and when it subsequently enacted the Trust Code effective January 1, 1984 . . . . Yet, in addressing self-dealing, the Legislature chose -- in the 1943 Trust Act, in the 1983 Trust Code, and again in the current Trust Code -- only to prohibit, subject to certain exceptions, exculpatory clauses that permit a corporate trustee to loan trust money to itself, buy trust property from itself, or sell trust property to itself. We therefore conclude that public policy, as expressed by the Legislature in the Trust Code, does not preclude a settlor from relieving a corporate trustee from liability for self-dealing, except for what is specified in sections 113.052 and 113.053.

*Id*. at 250 (citations omitted). In *Grizzle,* the Texas Supreme Court based its decision on Section 113.059 of the Texas Trust Code, which "broadly states that a settlor may relieve a corporate trustee from a 'duty, liability, or restriction imposed by this subtitle,' except for those contained in sections 113.052 and 113.053."[14] *Id*. at 249 (quoting former Section 139.059).

---

[14]At the time *Grizzle* was decided, Section 113.059 provided as follows:

17

Scott argues, pursuant to *Grizzle*, that the trust agreement waived all fiduciary duties. This argument, though, ignores the statutory changes which have occurred after *Grizzle* was decided. In response to *Grizzle*, the Texas Legislature chose to ameliorate the above-mentioned "harsh effects."[15] In 2005, the Texas Legislature repealed Section 113.059,[16] added Section 111.0035,[17] and added Section 114.007.[18] Section 111.0035 provides as follows:

> (a) Except as provided by the terms of a trust and Subsection (b), this subtitle governs:
>
> > (1) the duties and powers of a trustee;
> > (2) relations among trustees; and
> > (3) the rights and interests of a beneficiary.
>
> (b) The terms of a trust prevail over any provision of this subtitle, except that the

---

(a)     Except as provided by Subsection (b) of this section, the settlor by provision in an instrument creating, modifying, amending, or revoking the trust may relieve the trustee from a duty, liability, or restriction imposed by this subtitle.

(b)     A settlor may not relieve a corporate trustee from the duties, restrictions, or liabilities of Section 113.052 or 113.053 of this Act.

Act of May 27, 1983, 68th Leg., R.S., ch. 567, art. 2, § 2, 1983 Tex. Gen. Laws 3269, 3358, 3393, *amended by* Act of May 30, 2003, 78th Leg., R.S., ch. 1154, § 2, 2003 Tex. Gen. Laws 3254.

[15]House Comm. on Judicial Affairs, Bill Analysis (Substituted), Tex. H.B. 3503, 78th Leg., R.S. (2003); *see* House Comm. on Judiciary, Bill Analysis (Substituted), Tex. H.B. 3503, 78th Leg., R.S. (2003). In 2003, the Texas Legislature amended Section 113.059 of the Texas Trust Code. *See* Act of May 30, 2003, 78th Leg., R.S., ch. 1154, § 2, 2003 Tex. Gen. Laws 3254, *repealed by* Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 29, 2005 Tex. Gen. Laws 287, 296.

[16]*See* Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 29, 2005 Tex. Gen. Laws 287, 296.

[17]*See* Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 2, 2005 Tex. Gen. Laws 287, 287–88. In the bill analysis, the Texas Legislature stated Section 111.0035 "is necessary in light of *Texas Commerce Bank v. Grizzle*, 96 S.W.3d 240 (Tex. 2002)." House Comm. on Judiciary, Bill Analysis, Tex. H.B. 1190, 79th Leg., R.S. (2005).

[18]*See* Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 21, 2005 Tex. Gen. Laws 287, 293–94.

terms of a trust may not limit:

(1) the requirements imposed under Section 112.031;
(2) the applicability of Section 114.007 to an exculpation term of a trust;
(3) the periods of limitation for commencing a judicial proceeding regarding a trust;
(4) a trustee's duty:

    (A) with regard to an irrevocable trust, to respond to a demand for accounting made under Section 113.151 if the demand is from a beneficiary who, at the time of the demand:

        (i) is entitled or permitted to receive distributions from the trust; or
        (ii) would receive a distribution from the trust if the trust terminated at the time of the demand; and

    (B) to act in good faith and in accordance with the purposes of the trust. . . .

TEX. PROP. CODE ANN. § 111.0035 (West Supp. 2011). Section 114.007 provides:

(a) A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term relieves a trustee of liability for:

    (1) a breach of trust committed:

        (A) in bad faith;
        (B) intentionally; or
        (C) with reckless indifference to the interest of a beneficiary; or

    (2) any profit derived by the trustee from a breach of trust.

TEX. PROP. CODE ANN. § 114.007 (West 2007).

The Texas Trust Code prohibits waiver of duties, pursuant to Section 111.0035, and liability, pursuant to Section 114.007. Scott owed Courtney and Robin the fiduciary duties which, pursuant to Section 111.0035 and Section 114.007, cannot be waived. *See* TEX. PROP.

19

CODE ANN. §§ 111.0035, 114.007.   These statutory changes modify the effect of *Grizzle*.

### 2.   Subsection (b)(4)(A) and Subsection (b)(4)(B) Are Separate And Distinct Duties

In the alternative, Scott argues subsection (b)(4)(B) ("to act in good faith and in accordance with the purposes of the trust") of Section 111.0035 only applies in the context of a demand for an accounting.   Scott argues because the two subsections are linked by the conjunctive "and" that the two subsections must both be met, citing *M.S. v. State*, 137 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2004, no pet.).   The statute in *M.S.* is distinguishable from the statute at issue here. *M.S.* concerned the difference between a list of requirements linked by either a conjunctive "and" or a disjunctive "or."   *Id*.   These two subsections, though, are not lists of requirements, but separate and distinct duties.   Further, all of the list of requirements in *M.S.* had the same level of numbers, unlike the two subsections at issue here.   *Id*.   If the Legislature had intended Scott's interpretation, they would have numbered subsection (b)(4)(B) as (b)(4)(A)(iii).   The Legislature, though, numbered the subsection (b)(4)(B).   The "and" means that neither the duty described in (b)(4)(A) nor the separate and distinct duties described in (b)(4)(B) can be limited by the terms of the trust agreement.

### 3.   Subsection (B) Contains Two Duties:   1) Good Faith and 2) In ` Accordance With The Purposes of the Trust

Scott also alternatively argues that the phrase "in accordance with the purposes of the trust"

limits the duty of good faith.[19]   According to Scott, the duty of good faith contained in subsection

(b)(4)(B) only exists "when carrying out a duty imposed on him under that trust."   We disagree.

The phrase "in accordance with the purposes of the trust" is linked to "good faith" with the word

"and," not with the word "when."   The use of the word "and" indicates the subsection consists of

two independent clauses.   The plain meaning of the statute is that the phrase "in accordance with

the purposes of the trust" is an additional duty that a trust agreement cannot limit.   Subsection

(b)(4)(B) contains two duties consisting of a duty of good faith and a duty to act in accordance with

the purposes of the trust.

### 4.   The Jury Found Scott Violated Fiduciary Duties Owed to Courtney and Robin

The jury found, in Question 4, that Scott had "breach[ed] his fiduciary duties by filing and

pursuing the Harris County lawsuit."   Scott owed fiduciary duties which could not be waived

under the Texas Trust Code and has not challenged the sufficiency of the evidence[20] concerning

this jury finding.   One of the nonwaivable trustee's duties was to "act in good faith and in

---

[19]At trial, Scott testified he had a "Trustee's hat" which he would wear when he was acting as a trustee and then would remove when he was acting on behalf of himself.

[20]Even if a complaint had been made, we would review the evidence based on the charge submitted to the jury.   When the complaining party fails to object to the jury charge at trial, we measure legal sufficiency against the charge actually given to the jury.   *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008) ("[W]e review for legal sufficiency only under the charge as submitted to the jury."); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (by failing to object to court's charge, party was obligated to prove malicious credentialing by higher standard); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (Legal sufficiency must be conducted "in light of the jury charge that the district court gave without objection, even though, as we conclude, the charge's statement of the law was not entirely correct."); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

21

accordance with the purposes of the trust." In Question 5, the jury found one of the breaches of fiduciary duty was the trustee's filing of the lawsuit in the absence of good faith. The combined effect of the jury answers to Questions 4 and 5 was a finding that Scott breached his statutory duty of good faith to the beneficiaries of the trust.[21]

Scott argues these issues should never have been submitted to the jury because he could not "breach his fiduciary duties by filing and pursuing the Harris County lawsuit" because the trust agreement expressly gave him the right to take such action. He does not argue that there is no evidence to support the jury's finding that such breach was committed in the absence of good faith. Courtney and Robin point out that they are "lifetime" beneficiaries of the Dynasty Trust and its only asset is 635 shares of MRMC stock. With full knowledge of the pending line of credit and equity offering to the corporation, Scott filed the Harris County lawsuit against MRMC. There was evidence that any experienced business person would know that the lawsuit would prevent the equity offering and line of credit extension. No independent analysis was made concerning the negative effects of the lawsuit toward the beneficiaries. Scott was told that dismissing the lawsuit would allow the financing to proceed, but he refused. The lawsuit prevented the corporation from obtaining the equity offering and caused difficulty with credit after the line of credit was cancelled. The jury had this evidence to consider in determining if Scott's filing of the Harris County lawsuit was done in the absence of good faith.

---

[21]No objection was made that Question 5 was multifarious or to the instruction defining the parameters of the "absence of good faith."

**D. The Issue of Willful Misconduct or Personal Dishonesty Was Omitted From the Jury Charge Without Objection**

Scott also argues the evidence is legally and factually insufficient to establish he acted with willful misconduct or personal dishonesty. Section S of the Dynasty Trust Agreement provides: "S. Liability of Trustee. No individual Trustee shall be liable for negligence or error of judgment, but shall be liable only for such Trustee's willful misconduct or personal dishonesty."

Scott did not object to the omission of this issue when the jury charge was submitted to the jury. Any error resulting from the omission of this issue from the jury charge has not been preserved for review. TEX. R. CIV. P. 278; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007); *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007).

Even if error had been preserved, Section 114.007 prohibits liability from being waived if the breach was committed in bad faith, intentionally, or with reckless indifference to the interests of the beneficiaries. TEX. PROP. CODE ANN. § 114.007 (West 2007). The jury found, in Question 5, that the breach was committed "in the absence of good faith, intentionally or with reckless indifference to the interest of the Beneficiaries."[22] Thus, Section 114.007 would prohibit any waiver of liability pursuant to Section S.

---

[22]We note Scott objected to the substitution of "in the absence of good faith" for "bad faith" in the trial court. Scott does not argue this substitution caused reversible error.

23

## IV. The Evidence of "Other Damages"

Scott advances several arguments complaining of the $1,500,000.00 compensatory damage award for damages caused by the filing of the Harris County lawsuit.[23] We have consolidated Scott's arguments as A. complaints about the sufficiency of the evidence and B. complaints about the trial court overruling Scott's requested instructions.

### A. Sufficiency of the Evidence

Scott contends the evidence supporting the compensatory damages is both legally and factually insufficient. In determining legal sufficiency, we analyze "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *see also Walker & Assocs. Surveying, Inc. v. Austin*, 301 S.W.3d 909, 916 n.4 (Tex. App.—Texarkana 2009, no pet.). We credit favorable evidence if a reasonable jury could, and disregard contrary evidence unless a reasonable jury could

---

[23]Question 6 was:

> "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Courtney Stovall and Robin Martin for their damages, if any, proximately caused by Scott D. Martin's breach of fiduciary duty?"
> . . . .
>
> Consider the following elements of damages, if any, and none other; do not add any amount for interest on damages, if any:
>
> (a) Decline in the value of the shares of MRMC stock held by the Dynasty Trust.
>    Answer in dollars and cents, if any: $ __0__
> (b) Other damages, if any.
>    Answer in dollars and cents, if any: $ __1,500,000__

not. *City of Keller*, 168 S.W.3d at 827. In *City of Keller*, the Texas Supreme Court quoted with approval Chief Justice Calvert's seminal article on legal sufficiency:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*Id.* at 810 (quoting Robert W. Calvert, *"No Evidence"* & *"Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)); *see Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). When evaluating the sufficiency of the evidence, we measure the sufficiency of the evidence by the court's charge.[24] *Romero*, 166 S.W.3d at 221 (by failing to object to court's charge, party obligated to prove malicious credentialing by higher standard); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) (sufficiency measured by definition of malice contained in court's charge); *Osterberg*, 12 S.W.3d at 55.

---

[24]To the extent there is any difference between "bad faith" under Section 114.007 and the phrase "in the absence of good faith" contained in the court's charge, we will evaluate the sufficiency of the evidence based on the court's charge.

When reviewing a factual sufficiency challenge, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding and set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). When the party without the burden of proof on a fact issue complains the evidence is factually insufficient, the party must show the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding. *Clayton v. Wisener*, 190 S.W.3d 685, 692 (Tex. App.—Tyler 2005, no pet.); *see Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). Because the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, we may not substitute our own judgment for that of the jury. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

Scott argues "the jury seems to have plucked the $1.5 million "'Other damages'" figure at random from thin air; it has no apparent relationship to anything." His assertion is that the expert testimony all related to reasons for the decline of stock value, and since the jury found no decline in value of the stock, it necessarily follows that there was no damage suffered. He further argues that Courtney and Robin have presented no evidence "independent of the alleged decline in MRMC stock."

Dr. Robert Parrino, a professor of finance at the University of Texas at Austin, testified the

26

loss of financing was significant because it limited the ability of MRMC and MMLP to conduct ordinary business operations, to fund anticipated investments, and to maintain "financial flexibility," including the ability to react to unforeseen circumstances such as the market meltdown that subsequently followed.

Parrino explained that there were four reasons for the damages to Robin and Courtney—decline in stock value, increased cost of debt, delayed corporate investment,[25] and lack of liquidity of the stock owned by the trust. Parrino explained that the first three elements of damage were losses suffered by the corporation; since the trust owned 635 shares of stock (or 5.97 percent of the total) the beneficiaries suffered losses based on the percent of the trust's stock ownership. He further testified that Scott was attempting by his lawsuit to obtain control of MRMC, and the Dynasty Trust owned an important bloc of votes. He opined that Scott would not want to sell that stock, as trustee, but would use it in obtaining voting control of the company. Therefore, the shares owned by the trust were essentially taken off the market. Parrino estimated that the impact of Scott's motivation not to sell those shares reduced their value through a reduction in liquidity. Parrino testified that "this would result in a loss of value of $1,978,715 at the trust level."

The general rule is that individual stockholders, or, here, beneficiaries of a trust owning stock of a corporation, cannot recover for the corporate loss even though the stockholder may be

---

[25]The delayed investment was based on a "vacuum tower upgrade." The vacuum tower takes crude and separates it into various distillates and would have increased the value of each barrel processed. Parrino testified the delayed upgrade would cost MRMC $9,372,472, resulting in a loss to the beneficiaries of the trust of $599,985.00. He calculated the decline in stock value was $32,215,488, with a loss to the trust of $1,924,827. The trust's loss for increased cost of the corporate debt was $388,346.00.

injured by that wrong. *Murphy v. Campbell*, 964 S.W.2d 265, 268 (Tex. 1997) (citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990). If there is a separate duty owed to the stockholder and the individual owners incur a personal cause of action, the individual may recover. *Id.* Parrino's testimony concerning the damages for the corporate loss of stock value, increased cost of debt, and the delayed investment were all damages incurred by the corporation; the beneficiaries had no independent right to recover for these damages for that proportion of the stock owned by the trust. One method by which evidence is legally insufficient is if "the court is barred by rules of law . . . from giving weight to the only evidence offered to prove a vital fact." *City of Keller*, 168 S.W.3d at 810. We cannot give any weight to the opinion of Parrino about these damages when the beneficiaries have no right to recover for such damages. Since the beneficiaries have no right to recover damages for corporate losses, including corporate value decline, delayed investment opportunities, and increased cost of credit, this portion of Parrino's testimony is legally insufficient to support the award of "Other damages." The remaining possibility to sustain this "Other damages" award is the testimony that the trust itself suffered a separate loss.

Parrino testified that Robin and Courtney incurred a separate loss, unique to the trust, because their stock was held in trust with Scott as the trustee, and since he desired to control the corporation, he needed to have the authority to use the trust's stock for corporate voting and had no motivation to offer the trust stock for sale. According to Parrino, this made the stock owned by

28

the trust unavailable on the market, causing a loss of liquidity which reduced the trust's stock value by twenty percent resulting in a loss to the beneficiaries of $1,978,715.00.[26]

But his testimony was that the illiquidity caused a twenty percent reduction in the value of the stock owned by the trust. The problem with this recovery is that the jury specifically found that Courtney and Robin did not sustain any damages for "decline in the value of the shares of MRMC stock held by the Dynasty Trust." The only damage to the trust and the beneficiaries allegedly incurred by Scott's actions which caused illiquidity was a reduction in the stock value. Since the jury specifically found that the beneficiaries sustained no loss for decline in stock value, the beneficiaries cannot recover such element under the rubric "Other damages." As a result, the evidence is legally insufficient to sustain the jury verdict of $1.5 million in "Other damages."

---

[26]No objection was made to the reliability of Parrino's testimony. On appeal, no argument was made concerning the nature of his testimony except in a reply brief where Scott argues for the first time that Parrino's testimony contains "fatal gaps." An appellant cannot raise new issues in a reply brief. *See, e.g., Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 178 n.8 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

**B.  Requested Jury Charge Limiting Instruction on "Other damages"**

The jury charge submitted one element of damages very generally authorizing recovery for "Other damages, if any."   No definition or instruction explained further the meaning of the term "Other damages."   At trial, Scott proposed several limiting instructions concerning evidence that could not be considered by the jury in answering this issue; all such requests were denied by the trial court.[27]   Scott argues the trial court's "failure to give the requested limiting instructions, standing alone, was reversible error."   Scott cites *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002) and *Tyler Mirror & Glass Co. v. Simpkins*, 407 S.W.2d 807, 815 (Tex. Civ. App.—Tyler 1966, writ ref'd n.r.e.), in support of his argument.   Since we have found that the evidence is legally insufficient to sustain the jury verdict, it is not necessary to address the propriety of the jury charge on this issue.

**V.  Mental Anguish Damages**

Scott's remaining issues challenge the legal and factual sufficiency of the alleged breaches other than the filing of the Harris County lawsuit.   Courtney and Robin alleged breaches of fiduciary duty in addition to the filing of the Harris County lawsuit.   On appeal, Courtney and Robin argue Scott breached his fiduciary duties by failing to make a distribution, placing the trust in potential default, and failing to keep Courtney and Robin informed.   In Question 1 of the jury charge, the jury found that Scott breached "his duty to administer the Trust Agreement in good

---

[27]The limiting instructions would have instructed the jury that in answering this damage issue, it should not consider "wrongs" committed by Scott to the corporations, evidence of the decline of stock value, among other things.

faith and in accordance with its terms and purposes" as to both Robin and Courtney.[28]   In

Question 2 of the jury charge, the jury found the breach was "committed in the absence of good

faith, intentionally or with reckless indifference to the interest of the Beneficiaries."   For this

breach, the jury awarded $200,000.00 damages for mental anguish for each Courtney and Robin,

but awarded zero damages for monetary loss.

Courtney and Robin concede the evidence is insufficient concerning Robin,[29] but argue

there is sufficient evidence to support Courtney's award.   Because we conclude the evidence is

legally insufficient to support the mental anguish damages for both Courtney and Robin, it is not

necessary for us to address Scott's other challenges to the sufficiency of the evidence.

Courtney and Robin failed to establish the high degree of mental pain and distress required

---

[28]Question 1 contained the following explicit exclusion:

> For the purposes of deliberating on and answering this question, you are instructed to treat Scott D. Martin's actions as a shareholder, officer, or director of MRMC as being outside the scope of any fiduciary duty he owes to the Beneficiaries under the Dynasty Trust Agreement and not consider any such actions as a breach of his duties to the Beneficiaries.   Thus, for the purposes of this question, you are instructed that Scott D. Martin's action in filing and pursuing the shareholder derivative lawsuit in Harris County on September 5, 2008 should not be considered in answering this question.

> You are instructed that, in connection with your deliberation on this question, you are not to consider any evidence you may have heard regarding the failure of Scott Martin, if any, to resign upon request by Courtney Stovall and/or Robin Martin.

[29]In her appellee's brief, Robin states, "Scott claims that there is no evidence of mental anguish damages.   That is true as to Robin, which is why the trial court reduced her $200,000 award to $1."   We could construe this as a concession that the evidence is legally insufficient as to Robin.   In addition, Courtney and Robin conceded at oral argument that the evidence was insufficient to support the mental anguish damages awarded to Robin.   The trial court reduced the award for Robin from $200,000.00 to $1.00.   Some issues were raised at one time concerning the trial court's reducing some of the damages rather than suggesting a remittitur.   Due to the disposition of this case, we need not address those issues.

31

for mental anguish damages. The Texas Supreme Court has noted:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (quoting *Trevino v. Sw. Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex. Civ. App.—Corpus Christi 1979, no writ)). The court noted the definition of mental anguish is "nebulous" and requires reviewing courts to "distinguish between shades and degrees of emotion." *Id.* The Texas Supreme Court held that an award for mental anguish will normally survive appellate review if "the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish thus establishing a substantial disruption in the plaintiff's routine." *Id.* When, as in this case, there is not direct evidence of a substantial disruption, the Texas Supreme Court has instructed that the record should be examined for "any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.*

In the recent opinion in *Service Corp. International v. Guerra*, the Texas Supreme Court reversed an award of mental anguish damages. 348 S.W.3d 221, 231–32 (Tex. 2011). In *Guerra*, the jury awarded mental anguish damages to three daughters of the deceased when the cemetery disinterred and moved the body of their father. *Id*. at 232. One daughter testified that it was "the hardest thing I have had to go through with my family" and that she "had lots of nights

that I don't sleep." *Id*. Another daughter testified, "We're not at peace. We're always wondering. You know we were always wondering where our father was. It was hard to hear how this company stole our father from his grave and moved him." *Id*. There was also evidence from third parties that the daughters experienced "strong emotional reactions." *Id.*

Similar to *Guerra*, the evidence of mental anguish in this case is legally insufficient. In this case, Courtney testified,

> It's impacted our whole family. We don't - - for generations and generations to come, we don't have any - - it just hurts. It's affected my father. I worry about him every day talking to him on the phone, the stress. I worry about those in the company that have to deal with what's going on.

Courtney argues this testimony "is more than mere vexation or embarrassment but shows a substantial disruption in Courtney's life." We disagree. Courtney failed to establish a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. The evidence is legally insufficient to support both Courtney's and Robin's damages for mental anguish.

## VI. Exemplary Damages

The judgment awarded exemplary damages and the parties have extensively briefed that issue. But, due to our holding that the evidence is insufficient to sustain the jury verdict for compensatory damages, as a matter of law, there can be no recovery for exemplary damages. *Nabours v. Longview Savings & Loan Ass'n*, 700 S.W.2d 901, 903 (Tex. 1985*)*; *Doubleday & Co.*

33

*v. Rogers*, 674 S.W.2d 751, 754 (Tex. 1984); *City Prods. Corp. v. Berman*, 610 S.W.2d 446, 450 (Tex. 1980).

## VII.    Conclusion

The judgment of the trial court is reversed and judgment is rendered that Courtney Noel Martin and Robin Thomas Martin take nothing.


Jack Carter
Justice


CONCURRING OPINION

I agree with the disposition of this appeal made by the majority opinion of this Court.   I write, however, to respectfully set out my differing analysis of Section R of the Dynasty Trust. My analysis leads me to conclude that Section R was not intended to insulate Scott from potential liability for filing the Harris County lawsuit against MRMC.

Section R is titled "Transactions with Beneficiaries and Fiduciaries."   While that title is not determinative of how that section should be interpreted, I believe the heading is consistent with its intent.   The language of Section R is intended to target transactions, that is, business dealings, not lawsuits or actions beyond the commonly accepted meaning of the word "transactions."

In essence, the first sentence of Section R gives Scott permission "to purchase from, sell to, lend funds to, or otherwise deal with" a wide array of other individuals and entities, including "any

. . . corporation . . . in which the Trustee may have an interest," as if the actions were between "disinterested parties, except to the extent that the Texas Trust Code (or its successor statute) may expressly prohibit Settlor from authorizing any corporate Trustee serving hereunder from engaging in any such transaction."

Key language in that sentence provides the complete topical list of the type of transactions in which the trustee might engage. He may "purchase from, sell to, lend funds to, or otherwise deal with" various persons and entities, including MRMC,[30] for example. Here, "otherwise deal with" is the "catchall," the list's elastic term. I believe that, in the context of this language, "deal with" means something akin to "enter into a transaction or conduct business with."

Of course, "deal with" can, in the absence of a particular context, be understood broadly enough to include any encounter or strategy. In an obviously extreme example, one can, albeit illegally, "deal with" a rival by shooting him or her. A much less extreme example would be to "deal with" a rival by suing him, her, or it. But, when determining the intentions of the parties as expressed in a document, all parts of the document must be read together—individual clauses, words, or phrases should not be read out of context. *Burlington N. & Santa Fe Ry. Co. v. S. Plains Switching, Ltd.*, 174 S.W.3d 348, 356 (Tex. App.—Fort Worth 2005, no pet.). Courts should be "wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence or section of a contract." *State Farm Life Ins. Co. v. Beason*, 907 S.W.2d 430, 433 (Tex.

---

[30]Part of the extensive list of parties with which the trustee may "otherwise deal" includes "any . . . corporation . . . in which the Trustee may have an interest." That would clearly include MRMC, against which Scott filed suit. But that inclusion does not, in my opinion, expand the meaning of the phrase "otherwise deal with."

35

1995).

Here, in the context it is used, the term "deal with" does not suggest to me any intent to break out of the general flow of the paragraph, which addresses various forms in which parties may conduct business with each other. I do not believe "otherwise deal with" was intended to include the filing of a lawsuit by the trustee.

Therefore, I do not believe that the first sentence of Section R is intended to insulate Scott from possible liability from suing MRMC.

But, that is not the end of the analysis. There is a second sentence[31] in Section R. That sentence has three sections; the first setting out examples of roles Scott might be expected to play, the last providing that Scott would be subject to the same standard of liability applicable in transactions between disinterested parties, and the middle part that might, if read out of context, provide the relief from potential liability Scott desires.

That middle part says that no rule "relating to self-dealing or divided loyalty" will apply to "any act" of Scott. Scott is accused of breaching his fiduciary duty to the trust beneficiaries in various ways, including by filing the Harris County suit against MRMC. It seems fair to say he stands accused of "divided loyalty," which this middle provision might be interpreted to forgive.

---

[31]The second sentence follows:

> The provisions of this paragraph are made in full realization that said Trustee may be a partner, officer, director, member, or stockholder in any such entity or an executor, administrator or guardian of an estate, and no principle or rule relating to self-dealing or divided loyalty shall be applied to any act of said Trustee, but said Trustee shall be held to the same standard of liability in respect of such transactions as in respect of transactions with disinterested persons.

36

But, we are to read provisions of a contract with each other, not out of context. *Beason*, 907 S.W.2d at 433. Summarizing the three parts of the second sentence, that context says (1) that Scott might wear various hats with an entity or an estate in which the trust has an interest, (2) that no rule prohibiting self-dealing or divided loyalty shall apply, and (3) that, in any such transactions, Scott would be held only to the standards applicable to those dealing with disinterested parties. I conclude that the intent of the middle part of the second sentence was to say that Scott would incur no liability for any self-dealing or any divided loyalty *in any such transaction.*

And, while "transaction" can be understood more broadly than a business arrangement or dealing, the context of this section suggests to me the intent to use that (what I would consider) more common understanding of the word, as a business deal, similar to a purchase, sale, or loan.[32]

I concur with the remainder of the majority opinion.


Josh R. Morriss, III
Chief Justice


Date Submitted:        October 19, 2011
Date Decided:          March 20, 2012

---

[32]*See* http://dictionary.reference.com/browse/transaction.